TERRANCE M. REVERE  (HI Bar No. 5857)
Revere and Associates
Pali Palms Plaza
970 North Kalaheo Street, Suite A301
Kailua, Hawaii 96734
Telephone No: (808) 791-9550
terry@revereandassociates.com

BRUCE F. SHERMAN (HI Bar No. 5996)
1050 Bishop St., Suite 509
Honolulu, HI  96813
Telephone No: (808) 221-0901
bfs@bfshermanlaw.com

RICHARD L. HOLCOMB  (HI Bar No. 9177)
Holcomb Law, LLLC
733 Bishop St. Suite 1478
Honolulu, Hawaii 96813
Telephone No: (808) 545-4040
rholcomblaw@gmail.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| MAUREEN NOLAN, | ) <br> ) Civil Action No.  1:23-CV-00271 <br> ) |
| Plaintiff, | ) <br> ) COMPLAINT FOR DAMAGES, |
| v. | ) DECLARATORY AND <br> ) INJUNCTIVE RELIEF, EXHIBITS |
| PORTER MCGUIRE KIAKONA, LLP, | ) ONE THROUGH EIGHTEEN, and <br> ) SUMMONS <br> ) |
| Defendant. | ) <br> ) |

## COMPLAINT

## JURISDICTION

1.     Jurisdiction of this Court arises under 28 U.S.C. § 1331 and pursuant to 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1367 (supplemental jurisdiction).

2.     This action arises out of Defendant's violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq*. ("FDCPA") in their illegal efforts to collect a consumer debt.  This is also an action for damages for Defendant's abuse of process, intentional infliction of emotional distress.

3.     Venue is proper in this District because the acts and transactions occurred here, and Defendant transact business here.  28 U.S.C. § 1391(b).

## PARTIES

4.     Plaintiff, Maureen Nolan (hereinafter referred to as "Plaintiff" and/or "Ms. Nolan") is a natural citizen of the United States and the owner of Unit 110 at the Mokuleia Sands condominiums located at 68-055 Akule St., Waialua, HI 96791 ("the Unit"), which is the subject of Defendant's collection efforts.  Ms. Nolan is a "consumer" as defined by 15 U.S.C. § 1692a(3) and is authorized by law to bring this action.

5.     Defendant Porter, McGuire, & Kiakona, LLP (hereinafter "Defendant" or "PMK") is a "debt collector" as defined by 15 U.S.C. § 1692a(6), and is a for-profit corporation organized and conducting business in Hawaii. Defendant Porter

McGuire can be served through its registered agent, Kapono F.H. Kiakona, at 841 Bishop Street, Suite 1500, Honolulu, Hawaii 96813.

**6.** Other Defendants may be discovered in the course of litigation, and Plaintiff respectfully prays that the Court will permit the addition of later discovered parties upon motion.

<u>**FACTUAL ALLEGATIONS**</u>

7. Plaintiff Maureen Nolan has owned Unit 110 at the Mokuleia Sands condominiums located at 68-055 Akule St., Waialua, HI 96791 ("the Unit") since October 15, 2006.

8. The Unit was originally purchased by Ms. Nolan's mother.  The Unit was intended to provide a residence for Ms. Nolan's brother, Dennis.

9. Dennis resided at the Unit until 2008.

10. Ms. Nolan's mother and other family members also used the Unit when visiting Oahu.

11. Owners at Mokuleia Sands, including Ms. Nolan, are obligated to pay monthly maintenance fees to the Association of Apartment Owners ("AOAO"). Owners are also obligated to late fees when appropriate and as may be determined by the Board, and legal costs incurred in collecting any outstanding balances.

12. As of January 1, 2009, Ms. Nolan's account with the AOAO was current.  Thereafter, the AOAO claims the account became delinquent.

13.     From 2009 until approximately December of 2018, legal services were purportedly provided to the AOAO by the Ekimoto and Morris law firm ("Ekimoto").  Numerous legal charges were billed to Ms. Nolan's account from that time period.  *See* Exhibit One (Ledger from 1/1/09 through 8/1/11).  However, neither the AOAO nor PMK possess any agreements evincing the relationship between Ekimoto and the AOAO, or even attorneys' invoices or timesheets that might justify the inclusion of those charges on Ms. Nolan's account and/or the reasonableness of the attorneys' fees.

14.     No documents were ever provided to Ms. Nolan that would tend to justify the inclusion of the legal fees on Ms. Nolan's account or the reasonableness of the fees so included.  In particular, Ms. Nolan was never provided detailed (or any) attorneys' fees statements from Ekimoto for their purported work despite being demanded to pay for such work.

15.     Defendant is attempting to collect from Ms. Nolan legal fees with no basis or evidentiary support justifying the fees.

16.     Even if Defendant could make some showing that the legal fees were reasonable and properly billed to Ms. Nolan's account, the AOAO was not entitled to at least a portion of the fees demanded.  The legal fees have never been determined to be reasonable by any court or qualified person.

17.    On or about November 1, 2011, the AOAO retained Hawaiiana Management, Co. as its property management company.

18.    A balance forward entry was included on Ms. Nolan's Hawaiiana ledger.  *See* Exhibit Two (Ledger containing entries from 8/1/11 to 11/1/11); *and* Exhibit Three (Ledger 11/1/11 through 8/31/12).  This balance forward purported to show the outstanding charges on Ms. Nolan's account.

19.    Maintenance fees of $12,978.50 were claimed to be outstanding on Ms. Nolan's account as of November 1, 2011.  *See* Exhibits One and Two. On November 1, 2011, the total balance of purported maintenance fees was correctly stated on the Hawaiiana ledger balance forward as $12,978.50.  Exhibit Three.

20.    Late fees of $1,307 were claimed to be outstanding on Ms. Nolan's account as of November 1, 2011.  *See* Exhibits One and Two. The total balance forward of purported late fees was correctly stated on the Hawaiiana ledger as $1307. Exhibit Three.

21.    However, from January 1, 2009 until November 1, 2011, without providing any attorneys' fees invoices, the AOAO charged a total of $3707.44 in legal fees to Ms. Nolan's account:

- $68.49 on December 14, 2009;

- $369.92 on June 3, 2010;

- $373.82 on November 16, 2010;

4

- $1230.30 on February 3, 2011;

- $831.93 on March 4, 2011;

- $478.01 on April 7, 2011;

- $230.36 on September 2, 2011; and

- $124.61 on October 17, 2011.

*See* Exhibits One and Two.

22.     During this same time period, Ms. Nolan paid a total of $2765:

- $395 on April 8, 2011;

- $395 on May 9, 2011;

- $395 on June 13, 2011;

- $395 on July 8, 2011;

- $395 on August 8, 2011;

- $395 on September 13, 2011; and

- $395 on October 7, 2011.

*See* Exhibits One and Two.

23.     Each of Ms. Nolan's 2011 payments were applied exclusively to the legal fees.  *See* Exhibits One and Two. The legal fees included in the November 1, 2011 balance forward should have been $942.44.  However, $969.44 was charged to Ms. Nolan's account as legal fees per the balance forward.  Exhibit Three.  PMK continues to attempt to collect the unauthorized $27 amount.

24.    The AOAO appears to have changed its property management company at least three times during the period from January 1, 2009 until present.  When the AOAO retained the new property management company, the new property management company conducted no independent verification to ensure the accuracy of the amounts reported by the old property management company.

25.    Moreover, the property management companies made no representations or warranties to the AOAO regarding the accuracy of the amounts due.

26.    PMK knew or should have known that the balance of Ms. Nolan's account could be inaccurate.  Yet PMK sought to collect amounts reported by the property management company without attempting to conduct a reasonable investigation.

27.    PMK did not investigate the accuracy of the ledger before demanding amounts reported on the ledger from Ms. Nolan.

28.    PMK did not investigate the accuracy of the ledger before filing the lien in December 2020 complained of herein.

29.    PMK did not investigate the accuracy of the ledger before filing the counterclaim complained of herein.

30.    On March 25, 2010, the AOAO recorded a lien on the Unit claiming a balance due of $8,306.49 as of March 13, 2010.  Exhibit Four.  Yet, the ledgers show

that as of March 13, 2010, the total balance due was (at most) $6,081.99.  Exhibit One.

31.    From at least December 11, 2011 through at least February 24, 2012, the AOAO was attempting to foreclose on that lien and sell Ms. Nolan's unit via an unlawful non-judicial foreclosure.

32.    As of February 15, 2012, a total of $4,404.60 (including the unauthorized $27 balance forward) had been charged to Ms. Nolan's account for legal services.  Exhibit Three.  Insofar as PMK could produce any justification for the fees at all, a significant portion of those fees would be related to the lien and failed foreclosure.

33.    The lien and/or efforts to foreclose were unsubstantiated as the foreclosure failed.  Accordingly, not only was the AOAO not entitled to its attorneys' fees and costs related to this unlawful, unsubstantiated and unsuccessful non-judicial foreclosure attempt, but also Ms. Nolan was statutorily entitled to reimbursement of *her fees and costs* pursuant to HRS § 514B-157.

34.    PMK nevertheless continues to attempt to collect a portion of those fees.

35.    In April of 2012, Ms. Nolan filed for Chapter 7 bankruptcy and received a discharge in August that same year.  Months later, the AOAO only discharged a

portion of Ms. Nolan's total account balance from the relevant time period.  Exhibit Five.

36.    Despite having billed $4,404.60 in legal fees as of the filing of Ms. Nolan's bankruptcy petition, in February 2013, Exhibits One through Three, the AOAO credited only $1,244.60 in the unsupported legal fees as a result of the bankruptcy discharge.  Exhibit Five.

37.    Despite having accounted for a total of $14,878.50 in outstanding monthly maintenance fees as of the filing of Ms. Nolan's bankruptcy petition, Exhibits One through Three, in February 2013, the AOAO credited only $13,323.50 in the maintenance fees as a result of the bankruptcy discharge.  Exhibit Five.

38.    Despite having charged a total of $1,427 in late charges as of the filing of Ms. Nolan's bankruptcy petition, Exhibits One through Three, the AOAO credited $1,507 in late fees.  Exhibit Five.

39.    The total bankruptcy discharge applied by the AOAO was $16,075.10. *See* Exhibit Five. The total discharged amount should have been $20,790.01.  It is unclear why the AOAO waited until February of 2013 to discharge any of the debt.

40.    Similarly, late fees have been inconsistently charged to Ms. Nolan's account.  Neither PMK, its client the AOAO, nor the property management company can identify any basis for the charged late fees.

41.    From January 2009 until September 2012, a late fee of ten percent (10%) the current balance due was charged to Ms. Nolan's account.  Exhibits One through Five. Thus, when the monthly maintenance fee was $350, the late fee was $35 and when the monthly maintenance fee was raised to $400, the late fee was $40, etc.

42.    However, in October 2012, Hawaii First, Inc., the AOAO's then newly retained property management company, began charging late fees seemingly at random:

| DATE | TOTAL BALANCE DUE | CURRENT BALANCE DUE | AMOUNT OF LATE FEE | % of TOTAL BALANCE | % of CURRENT BALANCE |
|------|------|------|------|------|------|
| 10/30/12 | 17274.16 | 431.10 | 252.81 | 1.46% | 58.64% |
| 11/15/12 | 17549.06 | 442.09 | 1729.62 | 9.8% | 391.23% |
| 11/29/12 | 19278.68 | 442.09 | 253.74 | 0.13% | 57.3% |
| 12/15/12 | 19554.23 | 442.41 | 1731.87 | 8.86% | 391.46% |
| 12/29/12 | 21286.10 | 442.41 | 259.78 | 1.22% | 170.3% |
| 1/15/13 | 21965.88 | 420 | 1773.87 | 8.07% | 422.35% |
| 1/28/13 | 23739.75 | 420 | 25.58 | 0.11% | 6.09% |
| 2/15/13 | 8110.23 | 420 | 212.5 | 2.62% | 50.6% |
| 2/27/13 | 7482.73 | 420 | 19.28 | 0.25% | 4.59% |
| 3/15/13 | 7502.01 | 420 | 170.50 | 2.27% | 40.6% |

| 3/29/13 | 7672.51 | 420 | 23.62 | 0.31% | 5.62% |
|---------|---------|-----|-------|-------|-------|

Exhibit Five.

43.    Ms. Nolan never agreed to pay and the AOAO Board never authorized late fees at these varying percentages.

44.    To make matters even more confusing, on March 31, 2013, the AOAO applied a credit of $5,247.81 for a "Late Fees Adjustment" to Ms. Nolan's account. Exhibit Five. The reasons behind and calculation of this credit for Late Fees are unclear.

45.    Following the March 31, 2013 credit adjustment, Ms. Nolan continued to be charged two late fees despite having made timely monthly maintenance fee payments.  Exhibit Five.

46.    The first late charge imposed after March 31, 2013 was calculated at 10% of the monthly maintenance fee.  From April 2013 through March 2014, Ms. Nolan's account was charged with a $42.50 late fee each month.   From March 2014 through May 2015, Ms. Nolan's account was charged with a $33.69 late fee each month, which represented 10% of the monthly maintenance fee less the amount the AOAO held in reserved.  *See* Exhibit Five.

47.    However, the second late fee from April 2013 through May 2015 is even more specious:

| DATE | TOTAL BALANCE DUE | CURRENT BALANCE DUE | AMOUNT OF LATE FEE | % of TOTAL BALANCE | % of CURRENT BALANCE |
|------|------|------|------|------|------|
| 4/28/13 | 2448.92 | 425 | 24.61 | 1% | 5.79% |
| 5/28/13 | 2515.42 | 425 | 25.62 | 1.02% | 6.03% |
| 6/27/13 | 2583.54 | 425 | 26.64 | 1.03% | 6.27% |
| 7/27/13 | 2682.92 | 425 | 30.24 | 1.12% | 7.12% |
| 8/26/13 | 2756.75 | 425 | 31.33 | 1.14% | 7.37% |
| 9/25/13 | 3002.43 | 595.74 | 32.44 | 1.08% | 5.44% |
| 10/25/13 | 3044.93 | 425 | 34.39 | 1.13% | 8.09% |
| 11/24/13 | 3176.79 | 479.97 | 35.54 | 1.12% | 7.4% |
| 12/24/13 | 3254.83 | 425 | 36.71 | 1.13% | 8.63% |
| 1/23/14 | 3371.30 | 425 | 37.26 | 1.10% | 8.77% |
| 2/22/14 | 3413.80 | 425 | 42.22 | 1.23% | 9.93% |
| 3/24/14 | 3498.52 | 425 | 44.83 | 1.28% | 10.55% |
| 4/23/14 | 3696.99 | 544.95 | 46.15 | 1.25% | 8.47% |
| 5/23/14 | 3786.83 | 435 | 47.50 | 1.25% | 10.92% |
| 6/22/14 | 3878.02 | 435 | 48.87 | 1.26% | 11.23% |
| 7/22/04 | 3970.58 | 435 | 50.11 | 1.26% | 11.52% |
| 8/21/14 | 4064.38 | 435 | 51.36 | 1.26% | 11.81% |
| 9/20/14 | 4149.43 | 435 | 53.75 | 1.30% | 12.36% |

| 10/20/14 | 4311.21 | 509.34 | 55.07 | 1.28% | 10.81% |
|---|---|---|---|---|---|
| 11/19/14 | 4399.97 | 435 | 56.40 | 1.28% | 12.97% |
| 12/19/14 | 4490.06 | 435 | 57.75 | 1.29% | 13.27% |
| 1/18/15 | 4581.50 | 435 | 59.12 | 1.29% | 13.59% |
| 2/17/15 | 4674.31 | 435 | 60.51 | 1.29% | 13.91% |
| 3/19/15 | 4768.51 | 435 | 62.10 | 1.3% | 14.28% |
| 4/18/15 | 4864.30 | 435 | 63.54 | 1.3% | 14.6% |
| 5/18/15 | 4973.05 | 446.52 | 65.03 | 1.31% | 14.56% |

Exhibit Five.

48.     Ms. Nolan never agreed to pay and the AOAO Board never authorized late fees at these varying percentages.

49.     Mysteriously, in June and July of 2015, Ms. Nolan was only charged a late fee of $35.88, which represented 10% of the monthly maintenance fee less the amount the AOAO held in reserve.  Exhibit Five.

50.     It appears that no late fee was charged to Ms. Nolan's account in August, September, October, and November of 2015.  *See* Exhibit Six (Ledger 9/1/15 through 4/1/23).

51.     Yet, beginning in December 2015, Ms. Nolan's account was again charged with unauthorized late fees:

| DATE | TOTAL BALANCE DUE | CURRENT BALANCE DUE | AMOUNT OF LATE FEE | % of TOTAL BALANCE | % of CURRENT BALANCE |
|---|---|---|---|---|---|
| 12/16/15 | 5211.39 | 456.89 | 517.55 | 9.93% | 113.27% |
| 1/11/16 | 5175.51 | 456.89 | 517.55 | 10% | 113.27% |
| 2/29/16 | 6227.58 | 456.89 | 563.24 | 9.04% | 123.27% |
| 3/31/16 | 6790.82 | 456.89 | 608.93 | 8.97% | 133.27% |
| 4/30/16 | 7399.75 | 456.89 | 654.62 | 8.84% | 143.27% |
| 5/31/16 | 8054.37 | 456.89 | 700.31 | 8.69% | 153.28% |
| 6/30/16 | 8772.79 | 475 | 747.81 | 8.52% | 157.43% |
| 7/31/16 | 9536.71 | 475 | 795.31 | 8.34% | 167.43% |
| 8/31/16 | 10352.13 | 475 | 842.81 | 8.14% | 177.43% |
| 9/30/16 | 11213.05 | 475 | 890.31 | 7.94% | 187.43% |
| 10/19/16 | 12121.47 | 475 | 937.81 | 7.73% | 197.43% |

Exhibit Six.

52.     Ms. Nolan never agreed to pay and the AOAO Board never authorized late fees at these varying percentages.

53.     Moreover, Ms. Nolan was making timely payments during 2016.

54.     In addition to the late charge listed in the table above, on October 31, 2016, nine (9) separate late charges totaling $1,063.34 were inexplicably charged to Ms. Nolan's account.  Exhibit Six.  Ms. Nolan never agreed to pay and the AOAO Board never authorized the addition of these nine (9) separate late charges.

55.     Beginning in November 2016, Ms. Nolan's account was charged two (2) separate late charges each month.  Exhibit Six.  Similar to those complained of above, it appears that the amounts of the late charges were selected at random:

13

| DATE | TOTAL BALANCE DUE | CURRENT BALANCE DUE | AMOUNT OF LATE FEE | % of TOTAL BALANCE | % of CURRENT BALANCE |
|---|---|---|---|---|---|
| 11/16/16 | 14140.73 | 475 | 985.30 | 6.97% | 207.32% |
| 11/30/16 | 15126.03 | 475 | 147.80 | 0.98% | 31.12% |
| 12/16/16 | 15291.94 | 475 | 1032.81 | 6.75% | 217.43% |
| 12/31/16 | 16324.75 | 475 | 154.92 | 0.95% | 32.61% |
| 01/18/17 | 16497.78 | 475 | 1080.31 | 6.55% | 227.43% |
| 1/31/17 | 17578.09 | 475 | 182.05 | 1.04% | 38.33% |
| 2/16/17 | 17756.25 | 475 | 1127.81 | 6.35% | 237.43% |
| 2/28/17 | 18886.06 | 475 | 169.17 | 0.90% | 35.61% |
| 3/16/17 | 19073.34 | 475 | 1175.31 | 6.16% | 247.43% |
| 3/30/17 | 20248.65 | 475 | 176.30 | 0.87% | 37.12% |
| 4/17/17 | 20463.06 | 495 | 1224.81 | 5.99% | 247.43% |
| 4/30/17 | 21907.87 | 715 | 183.72 | 0.84% | 25.70% |
| 5/16/17 | 21960.49 | 495 | 1274.31 | 5.80% | 257.44% |
| 5/31/17 | 24399.98 | 1880.18 | 191.15 | 0.78% | 10.17% |
| 6/16/17 | 24316.13 | 495 | 1323.81 | 5.44% | 267.43% |
| 6/30/17 | 25639.94 | 495 | 198.81 | 0.78% | 40.18% |
| 7/17/17 | 26333.51 | 495 | 1373.31 | 5.21% | 277.43% |
| 7/31/17 | 27449.78 | 732.96 | 206 | 0.75% | 28.11% |
| 8/16/17 | 27655.78 | 495 | 1422.81 | 5.14% | 287.43% |
| 8/31/17 | 29078.59 | 495 | 213.42 | 0.73% | 43.12% |
| 9/18/17 | 29644.89 | 847.88 | 1472.31 | 4.97% | 173.65% |
| 9/30/17 | 31117.20 | 847.88 | 220.85 | 0.71% | 26.05% |
| 10/17/17 | 31833.05 | 495 | 1521.81 | 4.78% | 307.43% |
| 10/31/17 | 33490.98 | 631.12 | 228.27 | 0.68% | 36.17% |
| 11/16/17 | 33583.13 | 495 | 1571.31 | 4.68% | 317.43% |
| 11/30/17 | 35154.44 | 495 | 235.70 | 0.67% | 47.61% |
| 12/18/17 | 35526.26 | 495 | 1620.81 | 4.56% | 3.27% |
| 12/31/17 | 37147.07 | 495 | 243.12 | 0.65% | 49.12% |
| 1/17/18 | 37390.19 | 495 | 1670.31 | 4.47% | 337.43% |
| 1/31/18 | 39060.50 | 495 | 250.55 | 0.64% | 50.61% |
| 2/16/18 | 39311.05 | 495 | 1719.81 | 4.37% | 347.43% |
| 2/28/18 | 41030.86 | 495 | 257.97 | 0.63% | 52.12% |
| 3/15/18 | 41288.83 | 495 | 1769.31 | 4.29% | 357.43% |
| 3/31/18 | 43058.14 | 495 | 265.40 | 0.62% | 53.62% |
| 4/17/18 | 43323.54 | 495 | 1818.81 | 4.20% | 367.43% |
| 4/30/18 | 45142.35 | 495 | 272.82 | 0.60% | 55.12% |

| 5/16/18 | 45415.17 | 495 | 1868.31 | 4.11% | 377.43% |
| 5/31/18 | 47283.48 | 495 | 280.25 | 0.59% | 56.62% |
| 6/18/18 | 47563.73 | 495 | 1917.81 | 4.03% | 387.43% |
| 6/30/18 | 49481.54 | 495 | 287.67 | 0.58% | 58.11% |
| 7/17/18 | 49769.21 | 495 | 1967.31 | 3.95% | 397.43% |
| 7/31/18 | 51736.52 | 495 | 295.10 | 0.57% | 59.62% |
| 8/16/18 | 52031.62 | 495 | 2016.81 | 3.88% | 407.44% |

Exhibit Six.

56.    Ms. Nolan did not agree to pay and the Board did not approve late fees at these varying percentages.

57.    Ms. Nolan made timely monthly payments from November 2017 through December of 2018.

58.    From October 2017 through September 2018, the payments were not posted until the end of the month despite having been processed much earlier, typically from the 6th to the 10th of the respective month.  Exhibit Six.  The late fees charged in each of those months were further inflated due to this accounting method because those timely payments were not included in the total balance from which the late fees should have been calculated had any formula been consistently applied.

59.    On February 23, 2017, the AOAO recorded a lien against the Unit. Exhibit Seven.  According to that lien, the balance due on Ms. Nolan's account was $18,636.60 as of February 22, 2017.  That amount appears nowhere on the ledger. *See* Exhibit Six.  Even if one were to assume that the bogus charges were legitimate,

had Ms. Nolan's February payment been timely applied, the balance as of February 16, 2017 should have been $18,420.17.  *Id*.

60.     Beginning September 2018, the AOAO began charging Ms. Nolan two monthly late fees of $39.50 and $309.95.  Exhibit Six.

61.     In December 2018, a credit of $47,346.65 was also subtracted from the balance of Ms. Nolan's account.  Exhibit Six.  The credit was entered as "Late Charges."  *Id*.  According to the description, this was "waived LF per BOD."  *Id*. The amount of this "waiver" also makes no sense as $47,900.09 had been charged in late fees since December 2015, including a balance forward of $35.88 (which had been dramatically reduced through the application of numerous prior monthly payments).   It is unclear how the remaining $553.44 in late charges was calculated and to what time periods it applies.

62.     From January 2019 through May 2020, a single late charge of 10% of the monthly maintenance fee was applied each month to Ms. Nolan's account. Exhibit Six.  Ms. Nolan was also making timely monthly payments during this time period.

63.     From June to November 2020, no late fees were charged.  Exhibit Six.

64.     In November 2020, December 2020, June 2021, and September 2021 through April 2023, a single late charge of 10% of the monthly maintenance fee was applied each month to Ms. Nolan's account.  Exhibit Six.

65.     Ms. Nolan does not understand the various charges and credits entered on her account and cannot decipher how the balance is calculated.

66.     Throughout the years, Ms. Nolan has exchanged numerous emails and other correspondence with the AOAO and its lawyers and engaged in mediation.  To date, no one has even been able to explain how the balance is being calculated.

67.     On February 25, 2015, Ms. Nolan's bankruptcy attorney wrote Ekimoto to inform them that part of the balance that the AOAO was collecting at the time included debt that had been discharged in the April 2012 bankruptcy proceeding. Exhibit Eight.

68.     Ms. Nolan received no response.

69.     On April 17, 2017, Ms. Nolan's attorney, Harrison Chung, wrote Attorney Russell Ando (an associate with Ekimoto) and disputed the debt.  Exhibit Nine. Mr. Chung enclosed the ledger and specifically questioned fifteen (15) separate entries.

70.     Ms. Nolan received no response.

71.     Defendant PMK is a law firm that represents various Associations of Apartment Owners throughout the State of Hawai'i.  As part of its services, PMK collects debt from delinquent owners on behalf of those Associations.

72.     PMK is not involved with the accounts of individual owners unless the account is in default.

73.     At some point in 2020 or before, PMK began representing the AOAO at Molukeia Sands.

74.     In a letter dated August 7, 2020, Kapono Kiakona, managing partner of PMK, demanded $9,217.27 from Ms. Nolan.  Exhibit Ten.  That amount does not appear anywhere on the ledger.  *See* Exhibit Six.  The letter states, *inter. alia.*, "THIS COMMUNICATION IS FROM A DEBT COLLECTOR.  THIS IS AN ATTEMPT TO COLLECT A DEBT."  Exhibit Ten.

75.     On September 1, 2020, Attorney Bryan Krislock wrote Mr. Kiakona on behalf of Ms. Nolan and disputed the debt.  Mr. Krislock sought verification of the balance demanded in the August 7, 2020 letter.  Exhibit Eleven.

76.     On September 18, 2020, Mr. Kiakona responded to Mr. Krislock but only provided the same confusing ledger(s), with the same confusing and unlawful entries, that are both at issue here and also instigated Ms. Nolan's various disputes of the debt.  Exhibit Twelve.

77.     On January 13, 2021, Mr. Kiakona demanded $10,256.27 directly from Ms. Nolan.  Exhibit Thirteen.  Not only does that number appear nowhere on the ledger, but also Ms. Nolan was represented by Mr. Krislock at the time.  This letter also states, *inter. alia.*, "THIS COMMUNICATION IS FROM A DEBT COLLECTOR.  THIS IS AN ATTEMPT TO COLLECT A DEBT."  Exhibit Thirteen.

78.     On January 26, 2020, Mr. Kiakona wrote Mr. Krislock regarding "his client Maureen Nolan" and informing Mr. Krislock of remedies that may be available to Ms. Nolan pursuant to Hawai'i law.  Exhibit Fourteen.  Again, the same ledger with the same amounts was attached.  Exhibit Fourteen.

79.     On December 18, 2020, PMK recorded a lien against the Unit.  Exhibit Fifteen.  The lien states that as of December 8, 2020, Ms. Nolan owed the AOAO $10,015.21.  Exhibit Fifteen.  That amount appears nowhere on the ledger.  In fact, no balance shown on the ledger exceeded $10,000 until May of 2021.  *See* Exhibit Six.

80.     On December 29, 2021, Ms. Nolan filed her complaint in the matter styled *Maureen Nolan v. Association of Apartment Owners of Mokuleia Sands, et. al.*, 1CCV-21-001605.  There, Ms. Nolan raised five claims against the AOAO and its property management company, Hawaiiana, for the various indecipherable charges on the ledger and the December 2020 lien.

81.     On August 19, 2022, PMK filed a Counterclaim seeking foreclosure and/or a money judgment against Ms. Nolan.  Exhibit Sixteen.  There, PMK alleged that "[a]s of August 16, 2022, Defendant Nolan has failed and neglected to pay $25,424.78, the said sum representing outstanding maintenance fees, special assessments, attorneys' fees and costs, and other assessments …".  Exhibit Sixteen.

That amount appears nowhere on the ledger, *see* Exhibit Six, and is approximately two and a half times more than what PMK claimed was owed previously.

82.    The amount due as stated on the ledger did not exceed $25,000 until November 2022, three months after the filing of the Counterclaim.  *See* Exhibit Six. Moreover, the only additional legal fees that appear on the ledger from August of 2022 until April of 2023 is a single entry for $693.75 in March of 2023.  Exhibit Six. Thus, the balance demanded in the Counterclaim cannot be dependent upon attorneys' fees incurred in drafting the Counterclaim.

83.    Upon information and belief, PMK based the balance alleged in the Counterclaim on the ledger but added an amount to the demand in the Counterclaim that PMK would retain as additional "attorneys' fees" despite the fact that no such fees had been earned.

84.    PMK filed the Counterclaim pursuant to a Limited Power of Attorney executed by the AOAO.   This Limited Power of Attorney allowed PMK to file for foreclosure without the approval of the AOAO Board.  Exhibit Seventeen.

85.    PMK filed the Counterclaim without first conducting a reasonable investigation to ensure the accuracy of or even a good-faith basis for the allegations of the Counterclaim.   PMK calculated the balance due based on the ledger.  A reasonable investigation would have revealed the errors in the ledger complained of herein.

86.     PMK filed the Counterclaim in an attempt to force Ms. Nolan to pay its attorneys' fees without subjecting its work, billing practices, and/or invoices to scrutiny from the courts or opposing counsel.

87.     Fourteen entries for legal services purportedly provided by PMK were charged to Ms. Nolan's account from September 25, 2020 through March 31, 2023. Exhibit Six.  Those legal charges totaled $8,961.04.

88.     PMK never provided Ms. Nolan with any timesheets or invoices justifying their fees.

89.     During the course of the state court litigation, PMK still refused to provide unredacted attorneys' fees invoices or timesheets to justify their fees even though PMK was required to do so in discovery and any privilege had been waived. PMK blamed the AOAO Board for PMK's failure to disclose unredacted invoices claiming that the AOAO had instructed PMK to assert attorney-client privilege.

90.     In fact, no attorneys' fees invoices were ever provided to Ms. Nolan prior to her discovery request in the state litigation.  Many of the invoices that were finally provided in the state litigation were redacted to an extent as to render them illegible.   Exhibit Eighteen.   Ms. Nolan has been dunned for attorneys' fees throughout the history of this matter without being given a description or itemization of the attorneys' fees that were being demanded. In short, Ms. Nolan has been asked to pay for claimed attorney services (contrary to her interests) without knowing any

specific detail as to the claimed services. This runs entirely counter to the common practice and ethical requirement in the legal profession that lawyers provide detailed invoices for payment for work performed.

91.     PMK expects owners to pay its fees without ever reviewing any documentation justifying or even supporting the fees.

92.     In the state court litigation, the AOAO informed the undersigned that it would need to hire a forensic accountant to assist in determining the balance due and/or the ledger entries.

93.     On June 19, 2023, Ms. Nolan conducted the deposition of the AOAO's designee(s) pursuant to HRCP 30(b)(6).  Many of the issues complained of herein were raised and proven in that deposition.  Despite being given the opportunity to do so, PMK refused to dismiss the Counterclaim and has not withdrawn as the AOAO's representative.

94.     Ms. Nolan has been damaged as a result of the Defendant's actions. Ms. Nolan has had to hire four separate law firms over the years in her attempt to address these unlawful charges.  Ms. Nolan has incurred the expense of litigation in attempting to address Defendant's unlawful collection attempts.

95.     Ms. Nolan has incurred actual damages as a result of Defendant's conduct, including legal fees, costs, postage and gas expenditures.

96.    Ms. Nolan has suffered severe anxiety, fear, worry, and mental and emotional distress as a result of Defendant's conduct and the threat of foreclosure.

## CAUSES OF ACTION

### COUNT ONE –
### *VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT*

97.    Paragraphs 1-96, above, are expressly incorporated herein as if restated verbatim.

98.    Defendant has violated any or all of the following provisions of the FDCPA as set forth below.

### A. **False or Misleading Representations**

99.     The acts of Defendant constitute violations of the Fair Debt Collection Practices Act.  Defendant's violations of the FDCPA include, but are not limited to, the use of any false, deceptive, or misleading representations or means in connection with the collection of any debt, which is a violation of 15 U.S.C. § 1692e.

100.   The Counterclaim demands improper, confusing, and conflicting amounts from Ms. Nolan.   The Counterclaim seeks foreclosure of Ms. Nolan's apartment and a money judgment.

101.   The amount demanded in the Counterclaim includes unauthorized and incalculable late fees, unreasonable attorneys' fees charges with no explanation as to why they are included on Ms. Nolan's account, and attorneys' fees which the AOAO was not entitled to collect from Ms. Nolan.

102.   Ms. Nolan was and is confused as to how Defendant calculated the amounts they demanded and what authority they have to demand these improper amounts.

103.   Given the simple nature of the proceedings against Ms. Nolan (which included form demand letters, liens that the attorneys involved in the matter have filed thousands of times, and canned responses to Ms. Nolan's disputes where the AOAO or its attorneys bothered to respond at all), the legal fees demanded are grossly excessive, unfair and deceptive.

104.   No court has awarded fees or costs to the AOAO or to PMK in regards to this account.

105.   As described above, for years the AOAO and its attorneys have placed liens on the Unit demanding amounts that appeared nowhere on any ledger; refused to validate the amounts despite Ms. Nolan's numerous disputes; and refused to verify the amounts demanded despite having transferred the account between different management companies on at least three occasions.

106.   By demanding different account balances and adding illegitimate amounts of fees and charges to the underlying account, Defendant repeatedly made false, confusing, or misleading representations to Ms. Nolan about the amount of money she owed on the account in Defendant's various letters, the lien, and the Counterclaim.

107.   Defendant repeated demands for improper, confusing, and conflicting amounts from Ms. Nolan and she is confused as to how Defendant calculated said amounts and what authority they have to demand these amounts.

108.   Not only were these demands confusing to Ms. Nolan, but they would be confusing to the reasonable consumer, and certainly to the least sophisticated consumer.

109.   Defendant has a pattern or practice of such conduct directed towards Hawai'i apartment owners.

## B. False or Misleading Representations as to Amount and Legal Status of the Alleged Debt

110.   Defendant's violations of the FDCPA also include, but are not limited to, the use of false, deceptive, or misleading representations in connection with the character, amount, or legal status of the alleged debt, which is a violation of 15 U.S.C. §1692e(2).

111.   The actual amount of the alleged debt is certainly in question. It is overly confusing as to what amount is owed on this account since the demands of Defendant varied wildly.

112.   By demanding wildly differing amounts that increased and decreased by irregular and incalculable amounts, Defendant has confused Ms. Nolan as to what amount of money, if any, he owes on this account. This would be exceptionally confusing to the least sophisticated consumer.

113.   Ms. Nolan paid regular monthly payments but her balance continued to increase by incalculable amounts.

114.   Amounts that neither Defendant nor the AOAO are entitled to collect are included in the balance demanded by Defendant in the Counterclaim, including but not limited to:  the $27 mysteriously included in the November 1, 2011 balance forward of attorneys' fees; attorneys' fees associated with the unsubstantiated non-judicial foreclosure; and incalculable late charges.

115.   Ms. Nolan repeatedly disputed the debt alleged to be owed.  Throughout the years, and despite various transfers of the account to and from different property management companies, no one, including Defendant, ever performed any reasonable investigation to determine if the amounts were accurate.

116.   Despite the fact that the property management companies make no representation as to the accuracy of the amounts reported in any given ledger, and despite the lack of any independent verification of Ms. Nolan's balance by the AOAO (indeed, the AOAO does not even have the records to support the Ekimoto attorneys' fees) even after the transfer of the account through three separate property management companies, Defendant filed its Counterclaim seeking foreclosure of Ms. Nolan's apartment and a money judgment without attempting to verify the accuracy of the ledgers and in the face of Ms. Nolan's various disputes, including her state court claims.

117.   Upon information and belief, Defendant will claim that it relied upon the unproven ledger despite the fact that the amount demanded by Defendant appears nowhere in any ledger.

118.   Defendant has a pattern or practice of such conduct directed towards Hawai'i apartment owners.

## C. Unfair Practices and Collection of Unauthorized Amounts

119.   Defendant's violations of the FDCPA also include, but are not limited to, the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law, in violation of 15 U.S.C. §1692f(1).

120.   The letters from Defendant, the lien filed by Defendant, and the Counterclaim assert that different balances are owed, increasing the amount demanded.

121.   Among other unlawful amounts, Defendant continues to seek to collect:

- Incalculable late fees and interest;

- The $27 that was mysteriously added to the attorneys' fees balance on November 1, 2011;

- Attorneys' fees associated with the unsubstantiated non-judicial foreclosure;

27

- Unreasonable and excessive attorneys' fees;

- Attorneys' fees that are unsupported by any agreement between the law firm and the AOAO; and

- Attorneys' fees that are unsupported by any evidence connecting the fees to Ms. Nolan's account.

122.    Defendant demanded artificially inflated amounts throughout its collection efforts.  These amounts were not authorized by the agreement creating the debt, were not approved by the AOAO's Board of Directors, and/or were not authorized by law.

123.    The amounts sought by Defendant in their various communications include various fees not expressly authorized by the agreement creating the debt or permitted by law, and thus were demands in direct violation of 15 U.S.C. § 1692f(1).

124.    The Defendant's false representations of the character, amount or legal status of the debt are a use of a false, deceptive, and misleading representations or means in connection with collection of the debt or in an attempt to collect the debt, which is a violation of 15 U.S.C. §§ 1692e and 1692e(10), and are an unfair means to collect or attempt to collect the alleged debt in violation of 15 U.S.C. § 1692f.

125.    Defendant has a pattern or practice of such conduct directed towards Hawai'i apartment owners.

### D. **Harrassment or Abuse**

126.   Any conduct the natural consequence of which is to harass, oppress, or abuse any person is a violation of 15 U.S.C. §1692d.

127.   In the face of Plaintiff's numerous disputes of the debt and her state court claims, Defendant filed a Counterclaim demanding foreclosure and/or a money judgment in an amount that does not appear anywhere on the ledger.

128.   Had Defendant conducted a reasonable investigation as required by, *inter. alia*., HRCP 11, Defendant would have discovered the various inaccuracies, unauthorized charges, and incalculable fees that are the subject of this complaint.

129.   Instead, Defendant sought to harass and abuse Ms. Nolan by filing the Counterclaim based on erroneous and unauthorized amounts in an effort to coerce payment and/or have Ms. Nolan abandon her claims against the AOAO.

130.   The natural consequence of this conduct was to harass, oppress, or abuse Ms. Nolan.

131.   Defendant has a pattern or practice of such conduct directed towards Hawaiʻi apartment owners.

## COUNT II -
### *ABUSE OF PROCESS*

132.   Paragraphs 1-96 are expressly incorporated herein as if restated verbatim.

133.   For years, Ms. Nolan had challenged the various amounts demanded by the AOAO and its law firm(s).  Three separate lawyers had written the AOAO and its attorneys on behalf of Ms. Nolan disputing the various amounts demanded from Ms. Nolan.

134.   Ms. Nolan's ledger had passed through three separate property management companies during the time period relevant to this lawsuit.  PMK knew or should have known that none of the management companies warrant the accuracy of amounts reflected on any ledger.

135.   Instead of investigating the amount it sought to collect, on December 18, 2020, PMK recorded a lien on Ms. Nolan's apartment.  According to the lien, the amount due was $10,015.21 – an amount that appears nowhere on the ledger.  Upon information and belief, PMK padded the amount demanded in the lien by including unearned and unbilled attorneys' fees for work that had not been performed.

136.   The lien is designed to prevent the transfer of the property until such time as the lienors demands are satisfied.

137.   On August 19, 2022, PMK filed a Counterclaim seeking foreclosure and/or a money judgment against Ms. Nolan.  There, PMK alleged that "[a]s of August 16, 2022, Defendant Nolan has failed and neglected to pay $25,424.78."

138.   Foreclosure is an equitable remedy designed to enforce a creditor's secured interest in a property.   The money judgment, as in this instance, is designed to allow a creditor to utilize collection remedies that are otherwise unavailable, such as garnishment of wages.

139.   Neither of those remedies are intended to enrich the litigant's law firm.

140.   The amount demanded in the Counterclaim is nearly two and a half times the amount previously demanded.

141.   PMK knew or should have known that the amount demanded in the lien and/or Counterclaim was improper.   Had PMK conducted the reasonable investigation required by all attorneys before filing court documents, PMK would have discovered the various inaccuracies in the ledger.

142.   Yet, PMK based the amounts demanded on the ledger, adding a premium for its own attorneys' fees for work that had not been performed, billed, or earned.

143.   PMK intentionally filed the lien and/or Counterclaim, willfully demanding the improper amount.

144.   PMK was improperly motivated to cause such distress and anguish to Ms. Nolan that Ms. Nolan would simply pay the improper amount(s) demanded without subjecting the various illegitimate ledger entries (including the unsupported Ekimoto legal fees, the incalculable late fees, the $27 balance forward, and the

amount that should have been discharged pursuant to Ms. Nolan's bankruptcy proceeding), and, more importantly, PMK's own fees, billing practices, and/or attorneys' fees invoices to scrutiny by the state court or opposing counsel.

145.   Ms. Nolan has suffered damages in an amount to be determined by a jury at trial as a result of PMK's conduct.

## COUNT III –
### *Intentional Infliction of Emotional Distress*

146.   Paragraphs 1-96 are expressly incorporated herein as if restated verbatim.

147.   PMK knew or should have known that the amounts reflected in the ledger were inaccurate.  The "ledger" consists of several documents produced by at least three separate property managers during the relevant time period.  None of the property management companies provide any warranty that the amounts reflected are accurate.

148.   PMK at best recklessly disregarded Ms. Nolan's numerous disputes of the alleged amounts due, including but not limited to letters from three (3) different law firms.

149.   Instead of investigating the amount it sought to collect, on December 18, 2020, PMK recorded a lien on Ms. Nolan's apartment.  According to the lien, the amount due was $10,015.21 – an amount that appears nowhere on the ledger.  Upon information and belief, PMK padded the amount demanded in the lien by

including unearned and unbilled attorneys' fees for work that had not been performed.

150.   When Ms. Nolan finally gave up in her efforts to convince anyone to explain the amounts reflected on the ledger, Ms. Nolan filed a state lawsuit, based specifically on her claims that the amounts which collected were inaccurate.

151.   Nevertheless, PMK, based on its authority vested from a Limited Power of Attorney executed by the AOAO, filed a foreclosure action.  Through this filing PMK attempted to divest Ms. Nolan of any equity in the Unit and/or remove title of the Unit from Ms. Nolan – without suffering the inconvenience of having to explain the amounts demanded or the reasonableness of its own fees it seeks to have Ms. Nolan pay.

152.   PMK's conduct as complained of herein shocks the conscience and would lead a reasonable member of the public to exclaim "Outrageous!"

153.   The decisions attributed to PMK were made by lawyers who are highly sophisticated and versed in the practice of collecting debts on behalf of AOAO's.

154.   Ms. Nolan has suffered severe anxiety, fear, and mental and emotional distress as a result of PMK's conduct.

## SUMMARY

155.   The above-detailed conduct by Defendant and its agents in connection with collection of the debt, was conduct in violation of numerous and multiple provisions of the FDCPA, but not limited to the above-cited provisions.

156.   PMK also committed the torts of abuse of process and intentional infliction of emotional distress.

157.   As a result of Defendant's actions, Ms. Nolan is entitled to an award of actual damages, statutory damages, punitive damages, and an award of costs and attorney fees.

## TRIAL BY JURY

158.   Plaintiff is entitled to and hereby respectfully demands a trial by jury. US const. amend. 7; Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that judgment be entered against Defendant and in favor of the Plaintiff as follows:

a) Declaratory judgment that Defendant violated Mr. Warta's rights under the Fair Debt Collection Practices Act;

b) That Plaintiff be awarded actual damages pursuant to 15 U.S.C. § 1692k(a)(1) against Defendant in an amount to be determined at a trial by a jury;

c) That Plaintiff be awarded statutory damages pursuant to 15 U.S.C. §1692k(a)(2);

d) That Plaintiff be awarded the costs of litigation including a reasonable attorney fee pursuant to 15 U.S.C. §1692k(a)(3);

e) That Plaintiff be awarded general damages in an amount to be determined at a trial by a jury;

f) That Plaintiff be awarded punitive and/or treble damages;

g) That the Court declare all defenses raised by Defendant to be insufficient; and

h) Such other and further relief, including injunctive relief as may be necessary to effectuate the Court's judgment, or as the Court otherwise deems just and equitable.


Respectfully submitted, this the 29th day of June, 2023.


_s/Richard L. Holcomb_
TERRANCE M. REVERE
RICHARD HOLCOMB
BRUCE SHERMAN