# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MAUREEN NOLAN, | ) | Case No. 1:23-CV-00271 DKW-WRP |
| | ) | |
| Plaintiff, | ) | MEMORANDUM IN SUPPORT OF |
| v. | ) | PLAINTIFF MAUREEN NOLAN'S |
| | ) | MOTION FOR PARTIAL SUMMARY |
| PORTER MCGUIRE KIAKONA, | ) | JUDGMENT |
| LLP, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

# MEMORANDUM IN SUPPORT OF
# PLAINTIFF MAUREEN NOLAN'S MOTION
# FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

**I.  STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

**II. LEGAL STANDARDS FOR SUMMARY JUDGMENT** . . . . .   4

**III.  ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

       *A.  The Counterclaim was a Communication*
      *under the FDCPA.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      *B.  The FDCPA Elements* . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           **1.  Plaintiff is a "consumer"**
           **under 15 U.S.C. § 1692a(3).** . . . . . . . . . . . . . . . . . . . . .   9

           **2.  The debt arises out of a transaction**
           **entered into for personal purposes.** . . . . . . . . . . . . . .   11

           **3.  PMK is a debt collector within**
           **the meaning of the FDCPA.** . . . . . . . . . . . . . . . . . . . . .14

           **4.  PMK violated the FDCPA.** . . . . . . . . . . . . . . . . . . . .19

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

## TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . .   4

*Clark v. Capital Credit & Collection Servs.*,
460 F.3d 1162 (9th Cir.2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Donohue v. Quick Collect, Inc.*, 592 F.3d 1027 (9th Cir. 2010) . . . . . . 6, 7, 19

*Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957 (9th Cir. 1994) . . . . . . 4

i

*Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926 (9th Cir. 2007) . . . .  5, 6

*Heejoon Chung v. U.S. Bank, N.A.*,
250 F. Supp. 3d 658 (D. Haw. 2017) . . . . . . . . . . . . . . . . . . . . . . . . .  5, 11

*Heintz v. Jenkins*, 514 U.S. 291 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 14-15

*Henson v. Santander Consumer USA, Inc.*, 137 S.Ct. 1718 (2017) . . . . 14

*In re Kelly*, 841 F.2d 908 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . .  12

*Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984 (9th Cir. 2017) . .  14

*McCollough v. Johnson, Rodenburg & Lauinger, LLC*,
637 F.3d 939 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15

*McNair v. Maxwell & Morgan PC*, 893 F.3d 680 (9th Cir. 2018) . . . . . 14

*Nat'l Steel Corp. v. Golden Eagle Ins. Co.*,
121 F.3d 496 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Obduskey v. MacCarthy & Holthus*, 586 U.S. 466 (2019) . . . . . . . . . .  8

*Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002 (9th Cir. 2008) . . . .  19

*Reyes v. Kenosian & Miele, LLP*,
619 F. Supp. 2d 796 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . .  8

*Slenk v. Transworld Sys., Inc.*, 236 F.3d 1072 (9th Cir. 2001) . . . . . . . 13

*State Farm Fire & Cas. Co. v. Willison*,
833 F. Supp. 2d 1200 (D. Haw. 2011) . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Warta v. Porter, McGuire, & Kiakona, LLP*,
622 F. Supp. 3d 971 (D. Haw. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 15, 16

***Unreported Cases***

*Avery v. Gordon*, No. 08-139-HU,
2008 WL 4793686 (D. Or. Oct. 27, 2008) . . . . . . . . . . . . . . . . . . . . . .  9

*Camaj v. Makower Abbate Guerra Weggner Vollmer PLLC*,
No. 19-CV-10179, 2019 WL 6037597 (E.D. Mich. Nov. 14, 2019)  . . 11-12

*Galima v. Ass'n of Apartment Owners of Palm Ct.*
*ex rel. Bd. of Dirs.*, CIVIL 16-00023 LEK-KSC,
2017 WL 1240181 (D. Hawaiʻi Mar. 30, 2017) . . . . . . . . . . . . . . . . . .  16

*Glawe v. Carpenter, Hazlewood, Delgado & Bolen PLC*,
859 F. App'x 102, 103–04 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . 12-13

***Rules, Statutes, and Other Authorities***

15 U.S.C. § 1692a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

15 U.S.C. § 1692e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 19

15 U.S.C. § 1692f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Fed. R. Civ. P., Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Haw. R. Prof. Cond. Rule 1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

# I.  STATEMENT OF FACTS

This case arises from Defendant Porter McGuire Kiakona, LLC's ("PMK") attempts to collect an alleged debt from Plaintiff Maureen Nolan (Ms. Nolan), arising from Ms. Nolan's ownership of Unit 110 at the Mokuleia Sands condominiums located at 68-055 Akule St., Waialua, HI 96791 ("the Unit"). Ms. Nolan purchased the Unit from her mother in October 2006.  Nolan Decl. ¶ 5; CSF 3.  Ms. Nolan's brother lived in the Unit and family members would stay at the Unit when visiting Oahu. *Id*.; CSF 4.  In 2008, Ms. Nolan experienced financial hardship and was unable to continue to support her brother. *Id*. ¶¶ 7-8; CSF 5.  Only then was the Unit rented out – an arrangement that contradicted the intended use of the Unit when it was purchased.. *Id*. ¶ 8; CSF 6.

Owners at Mokuleia Sands are required to pay monthly assessments and other costs to the Association of Apartment Owners of Mokuleia Sands (the "AOAO") per the governing documents of the Mokuleia Sands condominium project. *Dkt*. 1 ¶ 11; *Dkt*. 14 ¶ 11; CSF 7.  In 2012, the AOAO adopted a policy to assess late fees at 10% of the total due plus 1.5% of the current outstanding amount.  Exhibit Thirteen, p. 257, line 15 – 258, line 12; CSF 8.  The AOAO **admits** that late fees were never properly calculated since the AOAO's late fee policy was adopted in 2012. *Id*.. 259, line 14 – p. 260, line 6; CSF 9.  The AOAO **admits** that Ms. Nolan could have never known how the late fees she was charged were calculated. *Id*. at p. 257, lines 7-11;

CSF 21.  Ms. Nolan did not agree to pay any of these irregular amounts.  Nolan Decl. ¶ 21; CSF 28.

Confusion as to the amount of the debt was exacerbated by the fact that AOAO changed property management companies multiple times, the last occurring in September of 2015, when the AOAO hired Hawaiiana for the second time.  Exhibit Thirteen,  p. 229, line 24 – 230, line 2; CSF 22.  Remarkably, when converting owner accounts between the property management companies, the AOAO and its property management company solely  rely on the balance provided by the prior property manager.  *Id*., pp. 25 lines 12-25 - p. 26 line 6; CSF 23. Similarly, PMK blindly relies on the property management company as to the amount of debt to be collected. Exhibit Twelve, p. 9, line 17-22; p.  11, lines 13-16; CSF 23.

"PMK has been providing legal services to clients for over thirty years, and the areas of law in which PMK performs debt collection are among PMK's [seven] main practice areas."  *Warta v. Porter, McGuire, & Kiakona, LLP*, 622 F. Supp. 3d 971, 984 (D. Haw. 2022); Exhibit Twelve at p. 26 line 17 – p. 27 line 25; p. 29 line 6 – 31 line 24; CSF 25.  PMK collects debts as part of its regular business. *Id*. p. 15, line 19 – 16, line 4; CSF 25.  PMK attempted to collect the maintenance and late fees from Ms. Nolan on behalf of the AOAO. *Id*. at  p. 33, lines 10-12; CSF 25.

PMK sent collection letters on August 7, 2020, September 18, 2020, January 13, 2021, and January 26, 2021 demanding amounts that do not appear on Ms. Nolan's account ledger.  Exhibits Two through Five, Ten; CSF 26.

After more than ten years of fruitless attempts to have someone explain how the balance was calculate (including the retention of three lawyers), on December 29, 2021, Ms. Nolan filed her Complaint against the AOAO in the matter styled *Maureen Nolan v. Association of Apartment Owners of Mokuleia Sands, et. seq.*, 1CCV-21-001605 (the "State Case") alleging that the AOAO violated UDAP and other claims related to these collection attempts.  Nolan Decl. ¶ 23; CSF 29. On August 19, 2022, PMK filed a Counterclaim in the State Case.  Exhibit One; CSF 30. The Counterclaim sought judicial foreclosure, monetary damages, and alleged that Ms. Nolan owed a debt, the amount of which was incalculable.  Exhibit One; CSF 31.  PMK demanded $25,424.78, a balance that does not appear on the ledger and is incalculable.  *Id*. at pp. 5-6 ¶ 22; CSF 31.  However, because of the balance forwards from the various property management companies, all of the prior incalculable fees and various indecipherable write-offs were reflected in the balance that PMK demanded in the Counterclaim.  Exhibit Thirteen, p. 235, lines 6-25; p. 237, line 3 – p. 240, line 1; CSF 34.

On June 29, 2023, Ms. Nolan filed the Complaint in this case alleging, *inter. alia*, that PMK violated the FDCPA.  This Motion follows.

## II. LEGAL STANDARDS FOR SUMMARY JUDGMENT

Pursuant to the Federal Rules of Civil Procedure,

[a] party may move for summary judgment, identifying each claim or defense- -or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

A genuine issue of material fact exists when a reasonable jury could return a verdict for the nonmoving party. "The moving party has the initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *State Farm Fire & Cas. Co. v. Willison*, 833 F. Supp. 2d 1200, 1209 (D. Haw. 2011). "This requires the nonmoving party to go beyond the pleadings and show by her own affidavits, or by the depositions, answers to interrogatories, or admissions on file, that a genuine issue of material fact exists." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 959 (9th Cir. 1994) (internal quotations omitted).

Conclusory allegations, without support, cannot defeat summary judgment. *Nat'l Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997). "A mere scintilla of evidence in support of the nonmoving party will [also] not suffice; there must be evidence by which a jury could reasonably find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

4

The FDCPA is a strict liability statute. See *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1175 (9th Cir.2006) (stating that the FDCPA does not require that a violation of § 1692e be knowing or intentional). The elements of an FDCPA claim are:

> (1) the plaintiff is a "consumer" under 15 U.S.C. § 1692a(3); (2) the debt arises out of a transaction entered into for personal purposes; (3) the defendant is a "debt collector" under 15 U.S.C. § 1692a(6); and (4) the defendant violated one of the provisions contained in 15 U.S.C. §§ 1692a–1692o.

*Heejoon Chung v. U.S. Bank, N.A.*, 250 F. Supp. 3d 658, 680 (D. Haw. 2017); *Warta v. Porter, McGuire, & Kiakona, LLP*, 622 F. Supp. 3d 971, 983 (D. Haw. 2022). Ms. Nolan is entitled to Partial Summary Judgment as to any or all of the elements of the FDCPA claim. Each element is discussed below.  Further, Ms. Nolan is entitled to Partial Summary judgment as to whether the Counterclaim in this matter was a "communication" under the FDCPA.

## III. ARGUMENT

### A.  The Counterclaim was a Communication under the FDCPA.

Since the inception of this case, PMK has sought to avoid the FDCPA altogether by asserting that its Counterclaim, Exhibit One, filed against Ms. Nolan is not an actionable communication pursuant to the holding of *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007).  Essentially, PMK would have this Court hold that debt collectors are immunized from liability under the FDCPA

where the debt collector's violative conduct occurs at any time after the consumer retains counsel.  PMK has no authority to support  such a sweeping ruling.  The holding of *Guerrero*, by its plain language, is limited to *letters from debt collectors addressed solely to the consumer's attorney*.  499 F.3d at 934.  (holding "that communications <u>directed solely to a debtor's attorney</u> are not actionable under the Act."); see also *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1031–32 (9th Cir. 2010) ("a complaint served directly on a consumer to facilitate debt-collection efforts is a communication subject to the requirements of §§ 1692e and 1692f.").

Here, there is no letter addressed solely to Ms. Nolan's counsel and, instead, the communication is the Counterclaim that PMK filed against Ms. Nolan.  Not only are lawyers obligated to communicate such filings to their clients, see HRPC 1.4, but also PMK attached to the Counterclaim a notice that addressed Ms. Nolan directly as required by Hawaiʻi law.  Exhibit One pdf pp. 27-49.  And, the entire filing was provided to Ms. Nolan as PMK must have anticipated.  See Nolan Decl. ¶ 25, Accordingly, this Court should reject PMK's argument for at least the following three reasons.

First, the United States Supreme Court has specifically held that "the Act applies to attorneys who 'regularly' engage in consumer-debt-collection activity." *Heintz v. Jenkins*, 514 U.S. 291, 299 (1995).  Such application would include the prohibition of misrepresenting the nature and amount of the debt.  15 U.S.C. § 1692e.

*Donohue,* 592 F.3d at 1030 ("Whether conduct violates §§ 1692e or 1692f requires an objective analysis that takes into account whether 'the least sophisticated debtor would likely be misled by a communication.'"). Exemption from FDCPA liability for attorneys who file such misrepresentations in court filings or pleadings makes no sense. "The line ... between 'legal' activities and 'debt collection' activities was not necessarily apparent to those who debated the legislation, for litigating, at first blush, seems simply one way of collecting a debt." *Heintz*, 514 U.S. at 297. Indeed, in 1986, Congress *repealed* a statutory provision exempting attorneys from the definition of "debt collector." See *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 951 (9th Cir. 2011).

Moreover, the facts of this case are strikingly analogous to those of *Heintz*. As summarized by the Ninth Circuit:

> In *Heintz,* Darlene Jenkins defaulted on a loan from a bank. 514 U.S. at 293, 115 S.Ct. 1489. <u>A lawyer from the bank's law firm, George Heintz, wrote a letter to Jenkins's lawyer listing an amount that Jenkins purportedly owed.</u> *Id.* Jenkins sued Heintz under §§ 1692e(2) and 1692f. *Id.* Heintz contested the applicability of the FDCPA to his debt-collection efforts because he was a lawyer engaged in litigation. *Id.* at 295. The Supreme Court held that the FDCPA 'applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation.' *Id.* at 299, 115 S.Ct. 1489.

*Donohue*, 592 F.3d at 1032. (finding that a conclusion that a complaint filed in Court was not a communication under the FDCPA "would put our decision in tension with

the Supreme Court's reasoning in *Heintz*.").  This Counterclaim should be treated no differently than the letter analyzed in *Heintz* or the Complaint analyzed in *Donohue*.

Second, since the Ninth Circuit decided *Guerrero*, the United States Supreme Court has squarely found that "foreclosure is a means of collecting a debt.  And a business pursuing nonjudicial foreclosures would, under the capacious language of the Act's primary definition, be one that regularly collects or attempts to collect, directly or indirectly debts." *Obduskey v. MacCarthy & Holthus*, 586 U.S. 466, 474-75 (2019).  And while those that merely enforce a security interest (via nonjudicial foreclosure) may not be subject to the *entire* FDCPA per *Obduskey*, here PMK specifically requested a deficiency judgment in its Counterclaim as discussed below. *See Id*. at 479-80 (availability of deficiency judgment "potentially relevant" distinction between judicial and non-judicial foreclosures); Exhibit One; CSF 30-31. *Obduskey* does not limit the exposure of those whose principal purpose is conducting judicial foreclosures and/or a deficiency judgment as here.

Third, several sister District cases have rejected the argument that a claim is immune from the application of the FDCPA under *Guerrero*.  *Reyes v. Kenosian & Miele, LLP*, 619 F. Supp. 2d 796, 801–04 (N.D. Cal. 2008) ("numerous out-of-circuit courts have interpreted *Heintz* to support the proposition that litigation activities of attorneys, including the filing of a complaint and other court documents, are subject to the FDCPA …" and rejecting any litigation privilege or immunity) (citations

omitted).  The United States District Court for the District of Oregon has squarely concluded "that a counterclaim for a debt <u>is not a representation made to an attorney, but rather a demand for money made on the debtor, through a pleading rather than a letter or a phone call</u>. Under *Guerrero* the issue is whether the conduct is <u>aimed at the debtor, regardless of whether the debtor has a lawyer</u>." *Avery v. Gordon*, No. 08-139-HU, 2008 WL 4793686, at *8–9 (D. Or. Oct. 27, 2008) (emphases added).

There is no genuine issue of material fact.  This Court should join its sister districts in finding that, as a matter of law, the Counterclaim was a communication aimed at Ms. Nolan and, therefore, distinguishable from the letter directed solely to the attorney that was analyzed in *Guerrero*.  Ms. Nolan is entitled to summary judgment as to this issue.

## B.  The FDCPA Elements

### 1.  Plaintiff is a "consumer" under 15 U.S.C. § 1692a(3).

The FDCPA defines consumer as "any natural person obligated or allegedly obligated to pay any debt."  15 U.S.C. § 1692a(3).

Here, there is no genuine issue of material fact as to whether Plaintiff is a natural person or that she was alleged to have owed a debt.  Indeed, PMK *formally* alleged that Ms. Nolan owed a debt when, on August 19, 2022, PMK filed its Counterclaim in the state case.  Exhibit One; CSF 30.  PMK specifically alleged:

> 9. As of August 16, 2022, Defendant Nolan has failed and neglected to pay $25,424.78, the said sum representing outstanding maintenance

9

fees, special assessments, attorneys' fees and costs and other assessments, although request for payment has been made by the Association to Defendant NOLAN. Additional maintenance fees, assessments, and attorneys' fees and costs, and other charges will be assessed against the Property every month following the aforesaid date.

10. Said sums are due and owing by Defendant NOLAN to Counterclaimant Association, and have been assessed against the Property and constitute a lien on the Property which may be foreclosed by Counterclaimant Association pursuant to HRS Chapter 514B and the Governing Documents.

11. Counterclaimant Association has recorded a written Notice of Lien on the Property, dated December 16, 2020, and recorded in said Bureau of Conveyances as Document No. A-76570902. See Notice of Lien attached hereto as **Exhibit "C."**

12. A written Notice of Pendency of Action is being filed concurrently herewith, and will be recorded on account of Defendant NOLAN's delinquency.

Exhibit One, p. 4 ¶¶ 9-12; CSF 31.

Moreover, before PMK filed its formal allegation, PMK sought to collect the alleged debt via letters dated:  August 7, 2020; September 18, 2020; January 13, 2021; and a letter to Ms. Nolan's (then) Attorney, Brian Krislock, dated January 26, 2021.  Exhibits Two – Five; CSF 26.  Each letter states that PMK represents the AOAO "to collect the debt owed to the Association.  Assessments and other charges for Unit 110 are due and owing."  *Id*.  Each contains the following FDCPA notice:

> ***THIS COMMUNICATION IS FROM A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT.  ANY INFORMATION OBTAINED AS A RESULT OF OR IN CONNECTION WITH THIS COMMUNICATION WILL BE USED FOR THAT PURPOSE.***

*Id.* Further, the alleged debt appears on Ms. Nolan's account and had accumulated for more than twelve years. Exhibits Six through Ten.

Finally, on December 16, 2020, PMK's partner, Kapono Kiakona, signed as the AOAO's attorney-in-fact a lien that PMK recorded and that alleges "[t]he lien is claimed in the amount of TEN THOUSAND-FIFTEEN AND .21/100 DOLLARS ($10,015.21) for unpaid amounts assessed by the Lienor as of December 8, 2020 …" Exhibit Eleven; CSF 27.

There is no genuine issue of material fact as to whether Ms. Nolan was alleged to have owed a debt. Ms. Nolan is entitled to partial summary judgment as to the first element of her FDCPA claim, *i.e.*, "the plaintiff is a "consumer" under 15 U.S.C. § 1692a(3)." *Chung*, 250 F. Supp. 3d at 680.

## 2. The debt arises out of a transaction entered into for personal purposes.

The FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for *personal, family, or household purposes.*" 15 U.S.C. § 1692a(5) (emphasis added).

In order to determine whether a condominium assessment falls within this statutory definition, a court must examine "the purposes that the [owner] ha[d] for purchasing the [unit] ... at the time of the [original purchase] transaction." *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 698 F.3d 290, 294 (6th Cir. 2012). If the condominium owner originally bought the unit for personal, family, or household purposes, then a subsequent assessment by the condominium association is a "debt" for purposes of the FDCPA. *Id.*

*Camaj v. Makower Abbate Guerra Weggner Vollmer PLLC*, No. 19-CV-10179, 2019 WL 6037597, at *5 (E.D. Mich. Nov. 14, 2019). It does not matter whether the Unit was used as a rental property *after* the purchase. Instead, "the 'transaction' at issue is the purchase of the … [p]roperty itself." *Glawe v. Carpenter, Hazlewood, Delgado & Bolen PLC*, 859 F. App'x 102, 103–04 (9th Cir. 2021) (citing 15 U.S.C. § 1692a(5)). Courts "must look to the purpose of the debt in determining whether it falls within the statutory definition." *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988) (applying the almost identical definition of "consumer debt" from the bankruptcy code, *i.e.*, 11 U.S.C. §§ 101(4), (11), and concluding that "[i]t is difficult to conceive of any expenditure that serves a "family ... or household purpose" more directly than does the purchase of a home and the making of improvements thereon."). Thus, in most cases, the purchase of a home (and, in turn, assessments arising from contractual obligations accompanying such purchase) meets the statutory definition of consumer debt. *Id*.

Accordingly, in *Glawe* the Ninth Circuit reversed summary judgment entered against the Plaintiffs where the Plaintiffs lived in Iowa, purchased a condominium in Arizona "intending to use it as a retirement home in ten to twelve years," but later decided to use the house as a rental property. *Id*. at 103. The Ninth Circuit found

> To determine whether the transaction was primarily consumer or commercial in nature, the court must 'examine the transaction as a whole, paying particular attention to the purpose for which the credit was extended.' This determination may be made as a matter of law. But

a genuine dispute of fact relevant to the inquiry may preclude summary judgment.

.

*Id.* at 103–04 (citations omitted); See *Slenk v. Transworld Sys., Inc.*, 236 F.3d 1072, 1075 (9th Cir. 2001) (in a case originating from this District, the Ninth Circuit held that genuine issues of material fact precluded summary judgment where a licensed contractor claimed that he bought a backhoe for the sole purpose of building his own residence).

Here, the Unit had long been used for Ms. Nolan's family's enjoyment. Nolan Decl. ¶¶ 3, 5; CSF 2. The Unit was purchased in 2000 by Ms. Nolan's mother to be used as a residence for Ms. Nolan's brother, Dennis. *Id.* ¶ 3; CSF 1-2.  In 2006, Ms. Nolan's mother retired from her position as the Director of the Head Start program on Kauai.  *Id.* ¶ 4.  In October 2006, Ms. Nolan purchased the Unit from her mother. *Id.* ¶ 5; CSF 3.  The Unit was intended to continue to be used as a residence for Dennis and Ms. Nolan's mother would also reside there during the winter months. *Id.*; CSF 4.  Additionally, family members would stay at the Unit when visiting Oahu.  *Id.* Unfortunately, Ms. Nolan's mother passed away unexpectedly from a cardiac event in November of 2006.  *Id.* ¶ 6.  And, without her mother's support, Ms. Nolan and other family members were unable to financially support Dennis.  *Id.* ¶¶ 7-8.  Accordingly, in 2008, Ms. Nolan asked Dennis to leave temporarily while she reorganized her debt and strengthened her financial condition.  *Id.* ¶ 8; CSF 5. The Unit was never rented out until May 23, 2008.  See *Id.* ¶¶ 5-8; CSF 6.

13

Thus, the Unit, at the time of the transfer was used and intended to be used for family or household purposes.  The alleged debt accrued because of Plaintiff's alleged failure to pay homeowner association fees to which she was obligated to pay per the governing documents of the Unit.  See *Dkt.* 1 ¶ 11; *Dkt.* 14 ¶ 11; CSF 7. Accordingly, Plaintiff's "obligation ... to pay money ar[ose] out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes[.]" *McNair v. Maxwell & Morgan PC*, 893 F.3d 680, 683 (9th Cir. 2018); see also *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 989–90 (9th Cir. 2017) (concluding that attorneys' collection letter regarding failure to pay homeowner's assessment fee constituted debt collection under the FDCPA).  There is no genuine issue of material fact and Ms. Nolan is entitled to summary judgment on the issue of whether the debt arose from a transaction conducted for "personal" purposes.

## 3.  PMK is a debt collector within the meaning of the FDCPA.

The FDCPA "defin[es] the term 'debt collector' to embrace anyone who 'regularly collects or attempts to collect ... debts owed or due ... another.' " *Henson v. Santander Consumer USA, Inc.*, 137 S.Ct. 1718, 1721 (2017). Thus, "attorneys who 'regularly' engage in consumer-debt-collection activity' " are debt collectors under the Act, "even when that activity consists of litigation." *McNair*, 893 F.3d at 683 (9th Cir. 2018) (citing *Heintz* 514 U.S. at 299). "In ordinary English, a lawyer

who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts." *Heintz* 514 U.S. at 294; *McCollough*, 637 F.3d at 951 (the *Heintz* Court "reasoned that lawyers who collect debts through litigation plainly fall within the statutory language defining " 'debt collector[s]' " to include those who " 'regularly collec[t] or attemp[t] to collect, directly or indirectly, [consumer] debts owed or due or asserted to be owed or due another.' "). Indeed, a prior version of the FDCPA's definition of "debt collector" which exempted lawyers was specifically repealed in 1986. *Id.*

Applying the FDCPA definition, this Court has specifically held that PMK is a debt collector under the FDCPA:

> PMK states debt collection is not its primary purpose, but PMK acknowledges that it performs debt collection in the course of the legal services it offers to its clients, such as in commercial litigation, enforcement of association rules and covenants, addressing delinquencies in association assessments, and litigation related to the foregoing. [Kiakona Decl. at ¶¶ 5-6.] PMK has been providing legal services to clients for over thirty years, and the areas of law in which PMK performs debt collection are among PMK's five main practice areas. See id. at ¶ 5 ("PMK has five main practice areas: community association law, real estate litigation, commercial litigation, construction litigation, and family law."). Thus, although the primary purpose of PMK's business is not debt collection, Kiakona's statements establish that PMK regularly collects or attempts to collect debts owed to or asserted to be owed to its clients.

*Warta*, 622 F. Supp. 3d at 984. In *Warta*, Judge Kobayashi also found the fact that PMK filed a state court case seeking, in part, damages including an unpaid $150 fine further supported the conclusion that PMK is, in fact, a debt collector. *Id.* As

additional support for her conclusion, Judge Kobayashi cited the several letters that PMK had sent Mr. Warta which specifically stated: "**This office represents the Association of Apartment Owners of Plumeria Hale (the "Association") to collect the debt owed to the Association.** Assessments and other charges for Unit No. 604 are due and owing." *Id*. at 984-84 (emphasis in original).  Judge Kobayashi also observed that each of the letters contained the required FDCPA disclaimer: "**THIS COMMUNICATION IS FROM A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT.**" *Id*. at 985 (emphasis in original).   Thus, Judge Kobayashi concluded:

> that PMK's representation of the AOAO in the State Court Case is analogous to an attorney's representation of a condominium association in a nonjudicial foreclosure proceeding. The purpose of the proceeding is, at least in part, to collect a debt owed to the AOAO, and the transfer of interest in Warta's Unit was not one of the purposes of the proceeding.

*Id*. at 986 (citing *Galima v. Ass'n of Apartment Owners of Palm Ct. ex rel. Bd. of Dirs.*, CIVIL 16-00023 LEK-KSC, 2017 WL 1240181, at *11-12 (D. Hawai'i Mar. 30, 2017) ("an attorney representing a condominium association in a nonjudicial foreclosure proceeding is attempting to collect a debt 'owed or due another.' … the aim of a foreclosure of a mortgage is to transfer interest in the property securing the defaulted mortgage, but the situation in the foreclosure of an association's lien is not necessarily the same....") (internal citations omitted).

The facts of this case are strikingly analogous to those of *Warta*. First, as discussed above, the Counterclaim specifically alleges that Ms. Nolan owed a debt to the AOAO. Exhibit One, p. 4 ¶¶ 9-12; CSF 31. Count I of the Counterclaim specifically seeks judicial foreclosure. *Id.* pp. 4-5 ¶¶ 13-17; CSF 30. Further, although it is unclear what precise claim that PMK intended to raise, Count II of the Counterclaim alleges that Ms. Nolan failed and neglected to pay amounts "due and owing" the AOAO, *Id.* at pp. 5-6 ¶¶ 18-24, and specifically $25,424.78 which included a purported $2,781.40 in late fees. *Id.* at pp. 5-6 ¶ 22; CSF 30-31. Thus, PMK prayed for monetary damages. *Id.* at p. 7 ¶¶ 2(C)(1) and (2); CSF 31.

Second, just as in *Warta* and as discussed above, the collection letters sent by PMK to Ms. Nolan specifically state that PMK represents the AOAO for the purpose of "collect[ing] the debt owed to the Association. Assessments and other charges for Unit 110 are due and owing." Exhibits Two through Five; CSF 26. The letters also contain the same notice as those in *Warta*: "***THIS COMMUNICATION IS FROM A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT.***" *Id.*

Third, Mr. Kiakona was also deposed in this case. Not surprisingly, Mr. Kiakona's testimony was almost identical to what Judge Kobayashi found dispositive in *Warta*. Here, Mr. Kiakona testified (CSF 25) that debt collection "is a service that my firm provides." Exhibit Twelve, p. 15, lines 7-13. PMK "do[es]

collect overdue maintenance fees, so [PMK] collect[s] debts owed to [its] clients." *Id.*, lines 19-21. And, "[w]e do it as part of our regular business. We do collect debts as part of our regular business." *Id.* at 16, lines 2-4. PMK sends collection letters on behalf of its clients "on a regular basis." *Id.* at 24, lines 23-24. All of the partners at PMK perform collection work. *Id.* at p. 20, lines 20-24. Five of the five paralegals working at PMK "primarily handle collections." *Id.* at p. 32, pp. 1-12. Members of PMK have even given lectures and interviews regarding debt collection. *Id.* at 18, lines 4-12. Indeed, PMK advertises on its website that debt collection is one of the "primary services" that PMK provides. *Id.* at p. 20; Exhibit Fourteen. And, PMK advertises a "flow chart" to provide its clients with information on how PMK's debt collection process operates. See *Id.* at p. 21; p. 22, lines 1-6, 25; p. 23 lines 1-8; Exhibit Fifteen. Further, when pressed, Mr. Kiakona reluctantly agreed with Judge Kobayashi's findings in *Warta* that PMK regularly collects debts. See *Id.* at p. 26 line 17 – p. 27 line 25; p. 29 line 6 – 31 line 24. And, Mr. Kiakona testified in his deposition "I believe Ms. Nolan owed maintenance fees and late and legal fees and so we did attempt to collect that from her." *Id.* at  p. 33, lines 10-12.

Despite its refusal to simply admit this element in response to Ms. Nolan's Request for Admissions, see *Dkt.* 38 (Plaintiff Maureen Nolan's Motion to Compel Discovery and For Sanctions), the evidence that PMK is a debt collector is

overwhelming.  There is no genuine issue of material fact and Ms. Nolan is entitled to summary judgment on the issue of whether PMK is a debt collector.

## 4.  PMK violated the FDCPA.

The FDCPA is a strict liability statute that "makes debt collectors liable for violations that are not knowing or intentional." *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005 (9th Cir. 2008).  "Seeking somewhat to level the playing field between debtors and debt collectors, the FDCPA prohibits debt collectors 'from making false or misleading representations and from engaging in various abusive and unfair practices.'"  *Donohue*, 592 F.3d at 1030 (quoting *Heintz* 514 U.S. at 292). Such false or misleading representations include "[t]he false representation of … the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2).  Moreover, debt collectors are prohibited from using "unfair or unconscionable means" in attempting to collect debts which includes "[t]he collection of any amount … unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1).  "Whether conduct violates §§ 1692e or 1692f requires an objective analysis that takes into account whether 'the least sophisticated debtor would likely be misled by a communication.'"  *Donohue*, 592 F.3d at 1030 (citing *Guerrero*, 499 F.3d at 934).

Here, PMK misrepresented the character, amount, or legal status of the alleged debt and/or attempted to collect amounts that were not authorized by the governing

documents of the Unit or permitted under law.  Specifically, as discussed above, PMK claimed in its Counterclaim that Ms. Nolan owed $25,424.78 including $2,781.40 in purported late fees.  Exhibit One at pp. 5-6 ¶ 22; CSF 31.  Yet, the amount demanded in the Counterclaim appears nowhere on the ledger, see Exhibit Ten, and is approximately two and a half times more than what PMK claimed was owed previously. See Exhibit Four (demanding $10,256.27); Exhibit Eleven (lien states that as of December 8, 2020, Ms. Nolan owed the AOAO $10,015.24); CSF 31.  The amount due as stated on the ledger did not exceed $25,000 until November 2022, three months after the filing of the Counterclaim. Exhibit Ten; CSF 32. Moreover, the only additional legal fees that appear on the ledger from August of 2022 until April of 2023 is a single entry for $693.75 in March of 2023. *Id*.; CSF 33. Thus, the balance demanded in the Counterclaim cannot be dependent upon attorneys' fees incurred in drafting the Counterclaim.  This, alone, entitles Ms. Nolan to summary judgment as to whether the FDCPA was violated.

Even if PMK could possibly produce some logical formula by which it could have divined the amount demanded in the Counterclaim from the amounts reflected in the ledger (which it cannot), the ledger, itself, misstates the amount and nature of the debt.  In 2012, the AOAO adopted a policy to assess late fees at 10% of the total due plus 1.5% of the current outstanding amount.  Exhibit Thirteen, p. 257, line 15 – 258, line 12; CSF 8.  This record is wrought with evidence that this policy was

never followed. Instead, late fees were assessed and deducted randomly. For example:

- from October 2012 until April 2013 random late fees were assessed that ranged from 4.59% to 391.46% of the "current balance" reflected in the ledger for the month the late fee was assessed or from 0.11% to 9.8% of the purported total balance for each of the months for each of the months in which the late fee was assessed.  See Exhibit Nine.[1]  The percentages and the assessed late fees varied wildly.  *Id*.  The AOAO has no idea how those late fees were calculated.  Exhibit Thirteen, pp. 146, lines 17=25-147, lines 1-2; p. 148, lines 10-17, 22-25; p. 149, lines 22-24; p. 151, lines 5-9; p. 153, lines 12-18; p. 154, lines 24-25 – 155, lines 1-6, 11-17; 165, lines 18-23; 166, lines 5-11; 168, line 25 – 169, lines 1-11; 170, line 15 – 171, line 10.  CSF 10;

- On February 12, 2013, the AOAO applied an incalculable credit of $1,507 against the late fees.  Exhibit Nine.  The AOAO has no idea how that credit was calculated, Exhibit Thirteen, p. 163, lines 1-17.  Yet, some of the previous late fees balance was still included in the remaining balance following the adjustment.  *Id*. pp. 164, line 15 – 165, line 9.  CSF 11;

- On March 31, 2013, the AOAO applied an incalculable credit of $5,247.81 for a "Late Fees Adjustment" to Ms. Nolan's account. Exhibit Nine.   Again, the AOAO has no idea why that adjustment was made or how it was calculated. Exhibit Thirteen, p. 171, line 16 – 172, line 13.  CSF 13;

- from April 2013 through May 2015 random late fees were assessed to Ms. Nolan's account ranging from 1 to 1.31% of the total balance or 5.79 to 14.6% of the "current balance" for the month in which the late fee was assessed.[2]  Again, the AOAO does not know how those late fees were calculated. Exhibit Thirteen, p. 173, line 16 – 174, line 8. CSF 14;

---

[1] The table in Paragraph 42 of the Complaint recites the amounts and percentages assessed for each month during the time from October 2012 through April 2013. *Dkt.* 1 ¶ 42.

[2] The table in Paragraph 47 of the Complaint recites the amounts and percentages assessed for each month during the time from April 2013 through May 2015.  *Dkt.* 1 ¶ 42.

- Yet, from December 2015 and through October 2016, Ms. Nolan's account was assessed with random late fees ranging from 7.73 to 10% of the total balance or 113.27 to 197.43% of the "current balance" for the month in which the fee was assessed.[3] Exhibit Thirteen, p. 252, line 12 – 253, line 8 (March 2016 amount upon which late fee supposed to be calculated does not appear on the ledger); p. 254, line 9 – 255, line 21 (April same).  CSF 15;

- on October 31, 2016, nine (9) separate late charges totaling $1,063.34 were inexplicably charged to Ms. Nolan's account. Exhibit Ten.  CSF 16;

- from November 2016 through August 2018, Ms. Nolan's account was assessed with two random late fees ranging from 0.57 to 6.97% of the total balance or 31.12 to 407.44% of the "current balance" for the month in which the late fee was assessed.[4]  Exhibit Ten.  CSF 17;

- In December 2018, a credit of $47,346.65 was applied to Ms. Nolan's account.  Exhibit Ten.  Again, this number has no formulaic connection to any of the balances owed or fees assessed.  *See* Exhibit Thirteen, p. 295, lines 2-17 (credit should equal the total of all late fees).  The total amount of late fees assessed since December 2015 was $47,900.09, including a balance forward of $35.88, Exhibit Nine, Exhibit Thirteen, p. 246, line 19 – 247, line 1.  It is unclear how the remaining $553.44 in late charges was calculated and to what time period it applies.  CSF 18-19.

---

[3] The table in Paragraph 51 of the Complaint recites the amounts and percentages assessed for each month during the time from December 2015 through October 2016.  *Dkt.* 1 ¶ 51.

[4] The table in Paragraph 55 of the Complaint recites the amounts and percentages assessed for each month during the time from November 2016 through August 2018.  *Dkt.* 1 ¶ 55.

Ms. Nolan never agreed to pay and the AOAO Board never authorized late fees at these varying percentages. Nolan Decl. ¶ 21; CSF 8, 28.  The Association has no evidence to dispute this contention.  Exhibit Thirteen, p. 147, lines 13-18.

These facts are not disputed.  The AOAO changed property management companies multiple times,[5] the last occurring in September of 2015, when the AOAO hired Hawaiiana for the second time.  *Id*., p. 229, line 24 – 230, line 2; CSF 22.   Remarkably, when converting owner accounts between the property management companies, the AOAO does not insist that the new management company take any steps to ensure the balance reported by the prior company is correct.  *Id*., p. 26, lines 1-6; CSF 23. Instead, the AOAO and its property management company blindly and recklessly  rely on the balance provided by the prior company.  *Id*., pp. 25 lines 12-25 - p. 26 line 1; CSF 23.   And, PMK blindly and recklessly relies on the property management company as to the amount of debt to be collected.  Exhibit Twelve, p. 9, line 17-22; p.  11, lines 13-16; CSF 23.

Thus, in 2015, when Hawaiiana became the AOAO's property manager, they took the balances reported by the prior management company at "face value." Exhibit Thirteen, p. 27, lines 15-25. The AOAO knew that Hawaiiana was not warranting that the balance was correct.  *Id*. p. 240, line 17 – 241, line 14.  No one knew or bothered to ascertain the correct balance of Ms. Nolan's account before

---

[5] Hence, the piecemealed ledger.  See Exhibits Six through Ten.

aggressively attempting to collect the alleged debt.  And, as a result of these balance forwards, all of the prior incalculable fees and various indecipherable write-offs were reflected in the balance that PMK demanded in the Counterclaim.  *Id*., p. 235, lines 6-25; p. 237, line 3 – p. 240, line 1.

The AOAO **admits** that late fees were never properly calculated since the AOAO's late fee policy was adopted in 2012. *Id*.. 259, line 14 – p. 260, line 6; CSF 9. The easiest examples of billing irregularities upon (any one of) which this Court could base its ruling that the FDCPA was violated begins in March 2016 through September 2018.  *Id*. p. 252, line 12 – p. 253, line 8 (March 2016 amount upon which late fee supposed to be calculated does not appear on the ledger); p. 254, line 9 – p. 255, line 21 (April same); p. 263, line 16 – p. 264, line 3 (September 2016 same); p. 261, line 3 – p. 262, line 7, and p. 278, line 21 –  p. 279, line 4 (irregularity continues from May 2016 until September 2018); p. 272, lines 21-24 (designee does not know how late fees were calculated form October 2016 though September 2018); p. 275, lines 13-15, p. 277 lines 3-11, 21- p. 278, line 15 (November 2016 - unknown formula applied by computer, should have been 10% of total but number upon which that is calculated is not shown on ledger); p. 278, line 21 - p. 279, line 4 (none of the late charges from November 2016 through August 31, 2018 can be calculated using the formula); See CSF 14-17.  The AOAO **admits** that the 2016 late fees were miscalculated and should have been corrected by a Hawaiiana accountant.  *Id*. p.

256, lines 13-24; CSF 9.   <u>Moreover, the AOAO **admits** that Ms. Nolan could have never known how the late fee was calculated.</u>  *Id*. at p. 257, lines 7-11; CSF 21.

There is no genuine issue of material fact as to whether PMK misrepresented the amount of the debt and/or attempted to collect amounts that were not expressly authorized by the agreement creating the debt.  There is no genuine issue of material fact as to whether the least sophisticated consumer would be misled by the amounts PMK attempted to collect.  No one knows the correct balance.   A finding in Ms. Nolan's favor *on any single one* of the numerous incalculable late charges and/or credits should result in summary judgment.  Similarly, if PMK cannot explain how the amount demanded in the Counterclaim was correctly and lawfully calculated, Ms. Nolan is entitled to up to $1,000 statutory damages and fees and costs.

## <u>CONCLUSION</u>

Ms. Nolan is entitled to summary judgment on the issue of whether the Counterclaim is a communication and as to each of the elements of the FDCPA claim.  Ms. Nolan is entitled to up to $1,000 in statutory damages and fees and costs as a matter of law.  Ms. Nolan has incurred significant actual and general damages as a result of PMK's conduct.  Thus, *only* the amount of damages as to Ms. Nolan's FDCPA claim should be left to the jury to decide.

DATED:  Honolulu, Hawaii, August 28, 2024.

/s/Richard L. Holcomb
Richard L. Holcomb
Terrance M. Revere
Bruce F. Sherman

Attorneys for Plaintiff Maureen Nolan